May it please the court, Mark Segment on behalf of the appellant, Randy Carney. The district court erred here because long-standing precedent from this court makes two things clear. First, a crime that has a mens rea of mere recklessness is not a crime of violence under the guidelines. And second, the crime at issue here required a mens rea even less than recklessness, mere culpable negligence. This court recently affirmed that principle in the Middleton case and then in the Hodge case. Chief Judge Gregory, you were on both panels, and that controls the result here. To begin with, there's a lot of areas of agreement here that there was error that was preserved, that review is de novo, that the categorical approach applies, not the modified approach, and that the enumerated offense clause of the career offender doesn't apply, and that North Carolina law allows assault to be committed with mere culpable negligence. And so the only issue that really remains is what is the law under that. Under the Vinson case and the Peterson case and the Garcia case and all the other cases, it's clear that under North Carolina law, which is a unique animal, having this culpable negligence thing, under the law, under North Carolina law, those are not crimes of violence. I think the only real issue then on the merits that I read is the effect of Hua Zin on the law here. Respectfully, I think that that issue was decided by this court in Middleton, and to the extent there wasn't any clarity about that then in the Hodge case. I think that if the court reads Middleton, to me it seems quite clear that there are two alternative holdings, both of which are sufficient to reach the result, both of which have two judges on them, Judge Gregory. Judge Floyd wrote that part, and it was concurrence. Yes, sir. And Judge Gregory, you wrote one opinion that had Judge Harris, and that is sufficient, and that reaches the result, but then Judge Floyd writes one that also gets Judge Harris, and so to me I think neither is dictated. They're alternative holdings. They're both controlling. To the extent to which there was any ambiguity about that, I think it was decided by Your Honor, who also wrote the Hodge case, where you then cited Judge Floyd's plurality opinion. I would note that the district court here did not have the guidance of Middleton, nor, of course, of Hodge, so to the extent that there was error, it wasn't necessarily the district court's fault. As far as why Voisin doesn't apply, I'm happy to, or why it doesn't affect the result here, I'm happy to get into that, but I would simply, for purposes of time, refer to Judge Floyd's opinion there. I think that he does a good job explaining the radical differences of the context of misdemeanor crime and domestic violence, the fact that Voisin itself said that it wasn't applying here, the fact that Justice Scalia and Johnson forestalled this issue and said that the context would be different. I would also note that one of the cases the government cites on the other side, the Height case, the defendant there filed a petition for writ of certiorari, and the U.S. Supreme Court called for the views of the Solicitor General. That's actually due today. The petitioner there certainly puts the Fourth Circuit on this side of the circuit split, and so I think that, to my mind, this issue has already been decided. I would also note that there's at least three cases, Towns and Smith and Vereen, all of which were decided after Voisin and all of which held that crimes of violence required more than recklessness. None of those opinions discussed Voisin, but they were all decided afterwards. I would note that the government, in one of those cases, Towns and argued the Voisin point on six pages of its brief, and then this court still held that crimes of violence require more than that. There is, of course, a circuit split about that, but I think that, again, that we've decided it here. I would also argue, even if the government's position here were right, that Voisin somehow affects the guidelines, and even if the government were right that it's created this whole new world of volitional versus non-volitional conduct, I think that North Carolina, this unique animal that it has still under that rubric, is not a crime of violence. I went through all the facts of all the cases in the North Carolina state cases, and I pulled out a few that I think are indicative of that. Number one is State v. Hoyle, the 2015 case where someone was convicted of failure to restrain a dog while being arrested. He's literally on the wall with his hands on the wall, and his dogs started attacking the officer, and he's convicted of North Carolina assault. To me, that's not even volitional under the government's purported rule. I would also refer the court to the Henry HML case, which is a sad case, but a straight negligent discharge of a shotgun by a juvenile. Just holding the gun, and it goes off, and it hits his friend. The only way that's volitional would be literally if the actus reus itself, the simple fact that he negligently pulled the trigger was enough, and I don't think that's enough. Again, I would note that the issue here is sort of unique to North Carolina, and so some of these other circuit cases are not entirely helpful, and I think the court should rely on Middleton and Hodge and all the other cases. I'm happy to answer any questions the court has specifically about that issue, which is the meat and potatoes. There's also the issue about whether the error here is harmless. The government has obviously raised that and argued that first in its brief. As the court knows, the government has the burden to show that, and the burden is that it has to be certain knowledge that the result would be the same. I don't think that we can have certain knowledge here. I would first point out to the fact that my client's sentencing was delayed once pending the decision in Thompson, which, Your Honor, was on that panel, and the court said, I really do try to get it right and that it's important to get it right, and my point would be that if it's so important to get the career offender thing right, that's inconsistent with saying that you would have given the same sentence anyways. If the court would have given the same sentence regardless, then it really shouldn't matter too much whether the career offender applied in this case. On the second sentencing, the one that we're on appeal today, the court even said, quote, the issue is, quote, obviously preserved and will, quote, be yet another one that continues to percolate its way towards Richmond. So I would suggest that's why we're here, and I'm not sure it makes sense to say that a sentence is harmless, but also that we're going to have an opportunity to come up here and resolve whether this career offender works. I would also note something that happened just a couple months ago, that the district court here, and I put this in my brief, says pretty in most all of the cases, I believe, that it would issue the same sentence in the alternative. A couple months ago, a few months ago, this case remanded a case under Ron Whitley, which is the docket number in this court of 17-4360. The district court had said that it would give the same sentence on remand regardless of which way this court ruled. This court ruled, this court reversed, and on remand, the district court gave 156 months instead of the 235 that it had always said that it would have received. And in that case, on appeal, the government also argued harmless error. And so that's a 79-month difference, which I think is the antithesis, to my mind, of harmlessness. So we rejected the harmless error analysis in that case and sent it back, notwithstanding the district court's representation. Is that what you're saying? Your Honor, frankly, I do not remember if the court rejected it or did not address it, but it was found not to be harmless, either implicitly or explicitly, and then remanded. I apologize for not knowing that right now. Were any reasons given for the district court's assertion or statement that it would have applied the same sentence notwithstanding? Certainly, Your Honor. No, no, I don't mean here. I mean in your case reciting. In the Ron Whitley case, again, frankly, Your Honor, I apologize. I don't know. I can certainly supplement with that and look. So I guess following up on Judge Duncan's analysis, I mean there is some discussion by the district court here as to why it would have imposed the same sentence and are we entitled to, I mean, required to consider that, right? What he did. Other than your concern about he tends to do this in every case, which, first of all, I don't know that that's exactly accurate because in the cases that he doesn't do that, we typically wouldn't see those on appeal. So, I mean, he just never is very meticulous. He's careful and he sees the precedent. He sees that there's a body of case law that allows him to correct for any errors that he might have committed on the record and he does that. I don't see anything necessarily nefarious about that. Certainly, Your Honor, and I do not at all mean to imply nefariousness. And the court here did say that this is what, and it provided, frankly, some bit of detail. This is what I would have done. I would have gone up to, you know, would have departed upward or very upward. I simply would suggest that given the standard on the Savala-Matute case of certain knowledge that it would have been the same, that at the very minimum, the court's statements that it wanted to get it right pending this court's decision in Thompson and that the issue is obviously reserved, that I don't think you can have certain knowledge. I would also suggest that I'm not sure that given what the district court here did in the Whitley case, I'm not sure there could ever be certain knowledge. And that's an issue for another day. But if the court, I think that in this case, given these facts, that there cannot be certain knowledge that the district court would have done the same thing. Again, I would point to the record for the sentencing transcript on the original sentencing when he said it mattered. The judge never said whether the career offender applies in this case matters in this case. He said that in the first sentencing. Now, again, it's somewhat different on the second. You know, I'd also note that this issue that we're on appeal today arises a lot in North Carolina. I believe the next case is another one of these issues. I think this case perfectly presents the issue. It's a well-developed record. I think it's well-argued, and I think that's another reason that the court ought to hear the issues. And finally, I noted this in my brief, but there's also these collateral issues about revocation proceedings and Bureau of Prisons about the treatment. And so even if Judge Deveron remanded or hypothetically would have departed upwards or issued a variance, that would have not – that would – the fact that my client has now designated a career offender affects his treatment both in the Bureau of Prisons, and we've confirmed that, regardless of whether there would have been a variance or a departure, and it affects him on any future revocation. And so that raises to me the question of how much harm is harmlessness. And to my mind, or to my knowledge, I don't think the court has addressed that specific issue about how much harm must there be. But to me, the fact that my client might appear, if he screws up again, you know, in 10 years on a revocation, and that he might be in a worse position now than if the career offender didn't apply, I think that by itself is reason enough for this court to hold that not harmless and to decide this so that he knows how big that sword of Damocles is that's hanging over him when he gets out of jail. If the court has any further questions, I'd be happy to answer. Otherwise, I'll reserve. Thank you. Thank you, Mr. Sigman. Mr. Rubin. Good morning. May it please the Court. Philip Rubin on behalf of the United States. I take some fear from the lack of questions from the Court about Voisin, and I certainly understand what that likely means. Yeah, I take some fear from Middleton and Hodges, too. Quite a few of the things you have to be fearful in the woods. Your Honor, I'd like the opportunity, even if the Court may already have made up its mind on that issue. Wait a minute. Counsel, you'd be very careful to say things like that to the Court. I know you don't mean it that way, but be very careful to say we've already made up our mind. I beg your pardon. I'm just saying it in terms of just future practice, but I understand. But sometimes it's not a good thing to tell the Court. I take your point and I beg your pardon, Your Honor. And it's also not correct. Go ahead, Judge Dunn. No, I was going to express my personal concerns because I don't make up my mind all that easily, as my clerks will tell you. I very much look for it. You might take my lack of questions as being just a dog at what you have to say. I appreciate that. Go ahead, Mr. Rubin. And I'll then proceed to that. I will also address the harmless error aspect of this. I think that's important. But I do agree with my colleague that this North Carolina assault issue is one that comes up frequently. I'll be in the district court tomorrow arguing this issue. In another case, because it comes up so often, you know, Judge Gregory, you've said, Chief Judge Gregory, you've said in the previous case you refer to the Wizard of Oz and said it's always good to start at the beginning. I think the legal version of that is that it's always good to start with the text. And when I look at the text of this guideline, I see not one word about mens rea. And that's interesting, right? Because if the Sentencing Commission or Congress, when they wrote ACCA, wanted an intent requirement, wanted this to be intentional force, that would have been the easiest drafting decision in the world. You just literally add the word intentionally to this clause, and we wouldn't be having this debate. No one would. I do have to tell you that to the extent that I have predilections, it's not to take a lot of comfort through arguments about negative implications. The fact that the court could have or Congress could have done something you didn't is not something I have learned over the years to draw a great deal of guidance. And I sometimes have the same hesitancy, Judge Duncan. I think here what's important, though, is the language that we do have, and that's what I'd like more to talk about. The negative implication is only that we don't have the sort of language that would just close the door. What we have is the use, attempted use, or threatened use of physical force against the person of another. And then we have the Supreme Court's decision in Boisillon that focused, laser focused on the word use and gave examples of violent force, I would add, examples of violent force against another person that were not intentional. And they said, of course, under the natural meaning of the word use, that's a use of force. Throwing a plate against the wall and not trying to hit a spouse, maybe intentionally trying just to scare her and not hit her, but the plate breaks against the wall and shards cut her. Did he use force against her? And the Supreme Court said the answer to that is obviously yes. Or you're walking through the door and someone's, you're mad at the person who's walking through behind you and you slam the door behind you. You know they're there. Did you use force? You didn't mean to hit them. You weren't trying to hit them. But you knew that they were behind you. Did you use force? The answer is yes. Now, that was the Misdemeanor Crime and Domestic Violence Statute, even though I note at the same time that in that case, the examples they gave were violent force against the person of another. Those would satisfy the Johnson 2010 standard for what is physical force. And so with that in mind, the question is, does Wazin apply outside the Misdemeanor Crime and Domestic Violence context? And Jessica, you mentioned cases lurking in the woods about Middleton, and I want to address Middleton, but I want to go back further because there is a binding case that precedes Middleton that requires this court to apply the same standard for use across the Misdemeanor Crime and Domestic Violence Statute in Section 16.  Vinson specifically says in it, because Vinson, of course, it took Garcia, which had held that the degree of force you need under 16A has to be intentional. And they said, since these are materially identical clauses, the Misdemeanor Crime and Domestic Violence Statute issue in Vinson and Garcia, then we apply that same standard. Well, how can that not be true in reverse? We now have the Supreme Court, having answered that question for the Misdemeanor Crime and Domestic Violence Statute. They said it does not have to be intentional. It has to merely be volitional. You have to be aware of the risk, but it need only be volitional. And wow, and so we already have case law. And it's actually Vinson is not the only case that says that we have, although I think it might be the best one, because this is the quote from Vinson. Because the relevant language in Section 16 is largely identical to that of 921.833A, Leach House definition of use is applicable to this case. That's a published decision of this court. Now, part of that decision has been abrogated by Voisin itself. The decision that you cannot commit a misdemeanor crime or domestic violence with less than intent. But that aspect is this court's final decision. Two more cases that came before Middleton, In re Irby and Reed. In re Irby, this was a slightly different take on what we're talking about with the word use, but it was still the word use. It was whether use can incorporate direct and indirect force or just direct force. Originally, this court in Torres Miguel had said it had to be direct force. It couldn't be indirect force. So the example in Torres Miguel was poisoning someone was not a use of force, just sprinkling poison in their drink, not a use of force. The Supreme Court in Castleman, a case about the misdemeanor crime or domestic violence version, said yes, you can use, again we're on the word use, you can use force without doing it directly. And their example was poisoning. They said poisoning someone was a use of force against them. This court in In re Irby applied Castleman's description of the use of force to Section 924C's force clause. In other words, they said what it means to use force in the misdemeanor crime or domestic violence clause is the same as 924C3A, which is in turn materially the same as the guidelines provision we have here. And they relied on Castleman again in this court in Reed. And they talked about how the Castleman court rejected the defendant's related argument that an indirect causation of injury, such as by poisoning, did not amount to the use of force. They applied it to the Armed Career Criminal Act. All of those cases are pre-Middleton. And so before getting to Middleton directly, to the extent Middleton conflicts with any of what I just said, those cases have to control. And I'm not sure that there is a way around that line in Vincent in particular. This court's already held that these are applied the same way. And there's actually good reason for that to return to the text. Because I do, Judge Duncan, recognizing that negative implications don't carry a ton of weight, I do think they can, because we don't have a mens rea here at all. What we have is just the use of physical force against the person of another. That's it. And so with all of those things together, the Supreme Court did not decide that it would apply. Judge Duncan, did you have a question? We have that here factually. But how does that help you under categorical terms? Do you mean in terms of culpable negligence here? That difference between culpable negligence and recklessness? Yes. Is that your question? So I think my first mission here is to convince you to apply Voisin. And then my second would be your question, which is, okay, even if you agree, did Voisin set the floor at recklessness or did it set it at something else? And I think one case that's very helpful in that is Mendez Henriquez out of the Fifth Circuit, which, by the way, that held that a prior en banc decision of their court was no longer good law after Voisin. And what they said in there was it's not really about anymore this question of mens rea. They said, and this is a quote from Mendez Henriquez, Voisin holds use separates volitional acts from involuntary motion, not recklessness from intention. Therefore, use requires that the act be more than involuntary but does not imply a requisite mental state. And that's borne out in the rest of Voisin. They actually at one point started talking about how mind numbing these different mens rea are. Now that's the Fifth Circuit's take on Post-Voisin, but not the Fourth Circuit. I will say it is the Fifth, Sixth, Eighth, Tenth, and D.C. Circuits. Well, you can count them all of them, but it's not the Fourth. And this panel can't change what the Fourth said about it, nor you, nor your argument. And that should bring us to Middleton, Chief Judge Gregory. Exactly. And I have looked, and I haven't seen a case from my colleague either, and I haven't found one. I have not seen the scenario because the Middleton concurrence, and it is a concurrence. It's listed as a concurrence. It's not in the opinion of the court. And as far as I know, and looking, the closest case I've found to speak of this is a case, it's not in our brief, but it's called Doudna v. Keller Burnside at 208 F. 3rd 467. And a footnote, it's a fight between the majority and the concurrence, and it says it goes without saying the majority opinion, not the gloss the concurrence seeks to place thereon, is controlling. It's a majority opinion in that case that controls the entire case, if nothing else. It's dicta. It has to be dicta. You could strike the entire concurring opinion, and it wouldn't change the outcome of the case. We know it's not necessary to the holding because it's not part of the opinion of the court. I don't think that means you should just ignore it. I think Middleton is well worthy of talking about it. The concurrence is a fascinating opinion on this. But I just don't think it binds you because it's not in the opinion of the court. Likewise with Hodge. Hodge, the government conceded that that crime did not count under the Arbor Criminal Act, and I would note we did not concede it because of this issue. That was Maryland reckless endangerment, a crime that doesn't require proof of contact that wasn't consented to by the victim. We were not conceding, nor, as I understand it, was anyone arguing about Wazin or any of those issues. Did it cite to the concurrence? It's c-cited. It's c-cited to the concurrence, Your Honor. It's cited, isn't it? If that, Your Honor. Did it do so approvingly or disapprovingly? It certainly cited for the statement of. Approvingly, correct? Yes, Your Honor. I'm not trying to avoid that answer, but what I want to say is the circuits, the five circuits and the one that have gone the other way, the six other circuits, have addressed that head-on in a controlling opinion. Addressed it head-on. If Hodge is the controlling decision on this, a decision that doesn't even cite, discuss Wazin, didn't take briefing on Wazin, if that's the controlling opinion on this, I think it would really be a benefit if this court would address it in a degree that the other circuits that have taken on this issue have taken it on. And so I don't think that in Hodge, which I would also contend, and I'm not trying to be the lawyer that claims everything he doesn't like is dicta, but that's also dicta because it wasn't anything anyone was arguing about in that case, about whether you could commit these crimes with recklessness or intent. It wasn't the issue in Hodge. And so I just don't think Hodge can be the controlling case. The litany of other cases my colleagues cite simply just did not deal with this issue. The closest is Townsend where it was about assaults, North Carolina assaults involving the intent to kill. And we certainly as a backup argued the Wazin issue, but the court there held that you can't commit an intent to kill a crime with culpable negligence. It has to be intentional. So it didn't matter. So none of those cases squarely addressed it. Middleton's concurrence did, but it's a concurrence. And if you disagree with me on that. It's not just a concurrence. Was it not? Another judge joined it? It was. That portion of it was a two-judge concurrence. And that's the scenario that I'm not familiar with. I've seen. I'm not familiar with re-admitted Supreme Court cases because a lot of times all we can figure out is what is the holding in terms of what you put them all together. And that is true, Chief Judge Greger, when you have no majority opinion in the Supreme Court. But when you have a majority opinion in the Supreme Court, the controlling law is the majority opinion. The opinion of the court is how they title it. The opinion of the court in Middleton, Your Honor, was your opinion. It was the opinion. And I have no ability to know why it was formatted as the opinion of the court in a concurring opinion that was joined in part by Judge Harris. But it was a concurring opinion. And as I understand it, concurring opinions are controlling. There's a narrow exception when you only essentially have plurality opinions in the Supreme Court. You find the narrowest ground that secure a majority. That's certainly true. And that's the only case I think my colleague cited was this court's opinion in an international refugee project. But that was talking about that scenario. We don't have that here. Your opinion. So you don't think the court was speaking at all? I do. I do. And I'd like to address the content of the Middleton concurrence because I think it's worthy of addressing. I don't think it's binding. If you look at that and on the merits you agree with it, I don't think there's any reason that the court shouldn't consider it to be persuasive authority from this court's colleagues. But at the same time, I don't think it's binding. In the same way that an unpublished opinion is still this court's colleague in speaking, it matters. They're not nothing. But they're also not binding if you disagree. And I hope to convince you to disagree. To address this culpable – and I think I got away, Judge Duncan, from your question about culpable negligence. And I do want to address that. And then I want to turn to the assumed error of harmlessness or the harmlessness aspect. Culpable negligence requires exactly what Voisin requires. I read from the Fifth Circuit about volitional conduct. If you read Voisin, it's not talking – it's talking about if you do it volitionally with awareness of the risk, that is a use of force. That is what meets the text of the guideline. It doesn't matter because, again, the text doesn't say anything about mens rea. What we're asking is whether you used force when you committed this crime, even if you did it with culpable negligence. And the case that I would read to you from that is a case called State v. Mundy. And it was about whether somebody who – they fell asleep driving, they crossed the center line, they hit somebody. Was that culpable negligence? And the North Carolina Supreme Court said, maybe. They said, in determining the question of culpable negligence, the focal point of the inquiry is whether the operator, because of drowsiness, previous tiring activities, or other premonitory symptoms of sleep, became aware of the likelihood. In fact, that's the difference between, in North Carolina, culpable negligence and tort negligence, ordinary negligence, which this is emphatically not ordinary negligence. Didn't your learned opponent over there cite a couple of cases where he claimed that the North Carolina Supreme Court, or at least an appellate court, had affirmed convictions for offenses even absent of politional conduct? I don't see any of those cases as saying that. The two that I think are the most on point to talk about, the Houston case and unpublished North Carolina Court of Appeals case, it was about motorcycle racing where the police were in the road waving them down with flashlights, and they slowed down at first and then sped past the officers. And one of them hit one of the officers and just, the injuries were horrific in that case. And ultimately when they decided that it met the standard, they were pointing to things like evidence of two prior speeding violations under similar circumstances and apparent disregard for patrol lights. In other words, awareness of the risk. At a minimum, first of all, I think that shows how this crime can't really even be committed in the kind of culpably negligent way that we're talking about. And if those are the best examples of cases, then I think that shows that when you're assaulting a law enforcement officer with reason to know that it is a law enforcement officer, then at a minimum you are doing so with awareness of the risk and you're not really finding sort of truly culpably negligent crimes. The second is Hoyle, the dog case. I would just urge the court, if that gives you pause to read that case, I have very little time left, so I would just say, this is a guy in the house assuming a fighting stance with his dog surrounding him to keep the cops coming in. I think we would say he was employing the dogs as a weapon, frankly. And I don't quite read it as he just happened to be in the house and the dogs happened to attack the officer. That's just, when you read the facts of that case, it's just not what happened there. So we would urge the court. A lot of states, one of the things that they cared a lot about in Guazin was that 34 different states would have their assault... But you realize that you're running low on time and you've not said anything about a homicide. I will turn to that. What I would say is this. Judge Jesus, you mentioned it's not necessarily nefarious for a district court to issue these a lot. There may be a case where the court is unsure whether a district court really would have given the same sentence. But wow, is this not the case. This judge specifically said, in the quote from it, he talks about the alternative counterfactual universe had career offender not applied. So he specifically said, he knew this was, based on his holding the case for Thompson, he knew that this was a question that was up in the air. He said, I think it counts as a career offender predicate. I think you're a career offender, so your range would be 151 to 188. But if I were to have gone the other way on that specific issue, the one we're debating here today, then I would have seen that the guideline range would have been 57 to 71. He actually said either one of those was not the sentence that was appropriate for this defendant because he sentenced below the career offender range and above the non-career offender range. And he gave extreme detail as to why he did that and how he did that. I mean, he said, you know, 151 to 188 would be too high. He didn't know, I think, the particular assault on the officer was a very serious offense. The officer had a cracked tooth, a broken nose. He said the crimes of conviction are not one but twice. Then he was arrested with more crack and he was resisting. But then he also credited defense counsel's argument that during the long period of time awaiting sentencing, he had actually done a very nice job of not having any infractions in prison. And he said, you should get some credit for that. And so he varied downward from the career offender. But then he said, but if your guideline range was 57 to 71, it would not account for your criminal history. And then he did a very standard, fully legally compliant, 4A1.3 upward departure based on lack of criminal history. And he found that the guideline range would be 100 to 125, and he would still give the defendant 120. I mean, unless we don't take the district court at its word, this is a clear, clear evidence that he would have sentenced him. And then the court's explanation shows that that sentence would have been reasonable. The one thing that I would like to address is about these collateral consequences, which, you know, the supervised release aspect is very speculative. You know, we don't know what would happen at the time. We also don't know that the defendant wouldn't be able to say at a revocation hearing, you know, later on the Fourth Circuit said I was not, you know, I wouldn't be a career offender because of later case law that came along. You should look at that. In a different case. In a different case. I don't know the answer, but I think it's speculative on that point. The other point is something that. That's speculative? I think it is, Judge Krueger. You don't think it's a benefit not having a career offender in your jacket, if you will? You know, career offender is sort of a transient designation in the sense that your next criminal conviction, if your instant offense, for example, is not a career offender predicate, you're not going to be a career offender. It's not like armed career criminal where sort of once you are. It's amazing, you know, coming to government, argues, oh, well, you know. First of all, there was no error. But if there was an error, well, then it doesn't make any difference. You win all the time, right, in that way. I mean, for example, you tell me we trust the judge. Yeah, sure we trust the judge. You know, Thomas Jefferson talked about it. He said that changing one's mind. He said you have a right to be smarter today than you were yesterday. Isn't that what about sentencing is? And we send many cases back to the same judge. But we do trust that they were individually looking before they were there. So you're saying just because at that point, snapshot in time, that makes it harmless because on that day, that's what he's entitled to if we agree that it was error. It's going back to being re-sentenced by an independent judge who does think from day to day in all situations, as Thomas Jefferson said, the right to be smart. The right, not the guarantee, but the right to be smarter today than I was yesterday. So you're saying, oh, well, he said that. Then you cure all evils. Well, you know what? I'm not telling you. I don't like you mentioning judges' names. It's not important. But the district courts just say, well, you know, bail and suspenders. If I was wrong and if I violated this, then all right. Would that be the standard in terms of that? Is that what we talk in terms of what justice is? May I answer your question? I hope you will. I would like to. And I want to answer it and not in the one-sentence thing because the red light's on, if you'll give me a chance to really answer your question. I think there's two parts to what you're saying. The first is, yes, judges can change their mind. I've seen instances where judges change their mind after the sentence was issued without error, and the rules don't really allow for that. I think the law allows for that possibility, and it should allow for that possibility. We also have cases like Pepper that allow for courts' honoree sentencing to take account of new facts. All of that is fine. But we talked earlier, when talking about the Voisin issue about binding case law, this court's published decisions and Supreme Court authority require that if this court finds that the court would have sentenced it the same either way and that that sentence was reasonable, it must be affirmed. Gomez-Jimenez, Hargrove, we talked about this court speaking. This court has spoken in those cases and then applied them in scores of other cases. Well, are you saying that as an appellate court we are required to find harmless error just because the court said, is that what you're telling us? No. That's what you just said. I'm telling you that if it meets the test in the published decisions. No, but you said the test is that I said this is what I would have given even if I am wrong. And you're saying this court has to find harmless error? Is that your argument? I just want to make sure that that's what you're saying. What I said, Your Honor. Is that yes or no? It's yes, but I mean. Okay. That's what I thought it was. Your Honor, what I was stating was the test that this court outlined in Gomez-Jimenez and Hargrove. That's the test. It's a two-part test in those cases, and it says if there is, quote. Is that a subjective or objective test? I will say that I believe Samuel Matute was the first one of them, if I recall correctly. Is it objective or subjective? This court hasn't spoken on that. We do have guidance in this area, as you suggest. We have Gomez. We have Montes Flores. We do have Hargrove. We do have standards for determining, I guess is your point. And what the court said in Samuel Matute was if there is, quote, knowledge that the district court would have reached the same result even if it had decided the guidelines issue the other way, and if the sentence would, quote, be reasonable even if the guideline issue had been decided in the defendant's favor, that is harmless error. I would submit to you that that is the law of the circuit. It's also the law of the Supreme Court of the United States, which has said the record, and this is from Melina Martinez. Isn't that procedural unreasonableness? This would be a procedural unreasonableness issue. In Linn, those cases in Linn, we talked about procedural. You asked for a, did he ask for a lower sentence? He did. Okay. In Linn it said you asked for a lower sentence. It doesn't matter whether or not we look at whether or not you've gotten a different sentence or whatever, but the fact that it's procedural and defective. This is procedurally defective. Why shouldn't he get a new sentence? Anything we find at the case. Those binding cases I cited, John, are procedural reasonableness cases, and this is a procedural reasonableness case, so it would apply to these. But the Supreme Court has said that the record in the case may show that the district court thought the sentence it chose was appropriate irrespective of the guidelines range. Judges may find that some cases merit a detailed explanation of the reasons the selected sentence is appropriate, and that explanation could make it clear that the judge based the sentence he or she selected on factors independent of the guidelines. If there's a better example of a case that will come before this court of a court doing exactly that, it would, I can't think of it because this court. Well, if we're bound by precedent, we're bound by precedent. And I think that's the answer. And I don't, I want to just, I want to make clear that the district court was very thoughtful about this. This isn't something that was some sort of rote, I don't care what happens in the Fourth Circuit. Now, you're reading the minds. Now, you know, Mr. Rubin, one thing about it is you're a very comprehensive person. You read minds and everything, and the record is the record. And I would. But then you're about, is it bought for you? Is it, are we to accept that, your spin on that too? I think. Everything that the government says. I don't think anyone's asking you to do anything, Your Honor, beyond what the record shows you to do. And I would just submit that if you look at the record, it shows that the district court was thoughtful and was comprehensive. And if I could just point one last one-sentence thing out. The other collateral effect the defendant points out was his BOP designation. If you look at the document that's cited, your security level in the BOP is affected by your criminal history points, not your criminal history category. Criminal history points are not affected by the career offender designation. For all the reasons that I've submitted here today, I hope the court will affirm the judgment. Thank you. Thank you, Mr. Rubin. Very briefly, Your Honors, to the point about collateral consequences for harmlessness, I don't understand the argument that it's speculative. When you apply the career offender, your criminal history goes to Category 6, and that is what would apply on any revocation of supervised release. I suppose that I can imagine a very good lawyer 10 years from now citing this whole argument as I'm speaking and making some argument that it should be a lesser category. But that, to me, seems more speculative than what I think we know, which is that the criminal history that is established in this case today is what's going to apply on revocation of supervised release. As far as all the precedents and harmlessness, I would note, too, that I think that one of the most animating considerations behind harmlessness, if not the only one, is certainly efficiency and not wasting money. And we do have the guidance from the U.S. Supreme Court in this summer on the Rosales-Morales case, which was not the exact same context. That was about plain error. But the court did call resentencing, quote, relatively inexpensive. And so to the extent that harmlessness is tied to that consideration, I think that we now have an intervening Supreme Court case that suggests strongly that harmlessness should be capped even further, or at least that consideration should be taken into account. Very quickly on Middleton, opposing counsel mentioned that you could take Judge Floyd's opinion, joined by Judge Harris, and strike it, and you would still have Your Honor's opinion with Judge Harris. That's true. It's also true in reverse. You can take Chief Judge Gregory, your opinion, with Judge Harris's concurrence. You could strike that, and you would have Judge Floyd and Judge Harris. That's why they're independent opinions that both reach the same result. And I think in that case, the law is clear that you have alternative holdings that are both controlling. Otherwise, they're both dicta. Absolutely. They both stand independently would have precedent. There's two judges. I hear you, and I'm perfectly comfortable with your argument in that regard. We take Middleton. It is what it is. But we also have precedent on the homicidal as well. And precedent is what it is. Certainly, Your Honor. And I am not up here asking for any alteration or overruling of precedent. The precedent stated is certain knowledge that the result would have been the same, and that's from the Sava-La Matute case. My argument today. I'm just reading from Gomez-Jimenez, Mott Explorers, and Harper. Right. And so my argument would be, number one, we don't have certain knowledge that the result would have been the same. We don't have that certain knowledge for a few reasons. One, because of the Court's own statements that it was important to get it right, both at the original sentencing and now. And also, we have these collateral consequences. And so the result would not have been the same. And so I think you can take the Fourth Circuit's, all of this Court's opinions, and faithfully apply them and say the result would not have been the same because of the collateral consequences. Well, but those collateral consequences were not imposed by the district court. And if we agree with you on the first point, then those collateral consequences go away, right? Well, they were imposed by the district court in the sense that because it applied the career offender here, that it imposed those consequences. And then it announced the alternative sentence saying, well, even if career offender didn't apply, I would get the same number of months in prison. And so I'm calling them collateral because the district court imposed them, but they're collateral to the number of months in prison. But if this court were to find this harmless, like getting down to brass tacks, if this court were to say this is harmless, my response would be how can that be true when my client now has these two very important collateral consequences, where he exists in the prison system, and more importantly, what is his criminal history category on revocation of release? And again, that's argument number two. Argument number one is, given the court's own statements here, that it's important to get this right. I just don't understand how this court can be, I think it's from the Sotelo Matute case, certain knowledge that the result would have been the same. I'm not sure how you can get to that point, that high level of certain knowledge given the court's statements here. If the court has any further questions, otherwise I urge reversal. All right. Thank you, Mr. Stiglitz. We'll come down to brief counsel and proceed to our last case for the term.
judges: Roger L. Gregory, Allyson K. Duncan, Albert Diaz